IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHARON T. LINNE,

               Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

No. CV 08-1287-MO

OPINION AND ORDER

**MOSMAN, J.,**

       Plaintiff Sharon T. Linne seeks judicial review of the final decision of the Commissioner of the Social Security Administration finding her not disabled and denying her application for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

       This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Following thorough and careful review of the record, the court REVERSES and REMANDS this case for further proceedings consistent with this opinion.

PAGE 1 - OPINION AND ORDER

# BACKGROUND

## I.    Administrative History

Ms. Linne protectively filed for DIB and SSI on March 1, 2005.  (A.R. 27, 449.)[1]  She alleges disability starting February 1, 2003, due to orthopedic injuries causing left ankle and right shoulder pain, degenerative disc disease, hyperthyroidism, Attention Deficit/Hyperactivity Disorder ("ADHD"), Dysthymic Disorder, Posttraumatic Stress Disorder ("PTSD"), and Reading Disorder.  (A.R. 27, 28, 189, 382, 435A.)  Ms. Linne's last insured date for DIB is June 30, 2005.  (A.R. 64.)  The application was denied initially and on reconsideration.  (A.R. 27, 449, 52-54, 440-42.)  An Administrative Law Judge ("ALJ") held a hearing on October 1, 2007.  (A.R. 463.)  At the hearing, Ms. Linne was represented by an attorney.  (*Id.*)  Ms. Linne and vocational expert ("VE") Gary Jesky testified at the hearing.  (A.R. 464.)

The ALJ issued a decision on November 30, 2007, in which he found that Ms. Linne was not entitled to receive benefits.  (A.R. 25.)  That decision became the final decision of the Commissioner on September 5, 2008, when the Appeals Council denied Ms. Linne's request for review.  (A.R. 5-7.)  This appeal followed.

## II.    Ms. Linne's History

At the time of her alleged disability onset date, Ms. Linne was a forty-five-year-old woman.  (A.R. 77.)  She has a high school diploma and may have attended some special education classes.  (A.R. 130, 187, 429.)  Ms. Linne has worked as a convenience store clerk,

---

[1] Citations "A.R." refer to indicated pages in the official transcript of the administrative record filed on January 15, 2009 (#8).

PAGE 2 - OPINION AND ORDER

managed a dry cleaners, helped out at her father's mailing company, and most recently worked as a care giver for several years.  (A.R. 110-11, 151, 362, 471.)

In 1984, Ms. Linne fell down the stairs and injured her left ankle, requiring surgery. (A.R. 345.)  The following year, she had a second surgery to remove the screws placed during the first surgery.  (*Id.*)  Then in October 1986, while working at a 7-Eleven store, Ms. Linne slipped and fell, landing on her left foot and ankle.  (*Id.*)  It appears that a walking cast was prescribed as a result of the second fall.  (A.R. 347.)  This ankle injury has continued to cause pain and has led to several other operations, including an arthroscopic synovectomy in 1987, the removal of a sural neuroma in February and again in November 1989, an arthroscopic debridement in 1991, and the removal of another neuroma in 2002.  (A.R. 348-60.)  Ms. Linne fell several times in late 2005 due to her left foot being numb when she arose from her bed.  (A.R. 359-60.)

In 1990, Ms. Linne fell and separated her right shoulder.  (A.R. 350.)  This was corrected in 1991 with a right distal clavicle excision.  (A.R. 361.)  More surgeries followed in July 1993, August 1994, June 1995, June 1997, and May 2003.  (*Id.*)  She has undergone physical therapy for both her ankle and shoulder injuries.  (A.R. 215-94, 337.)

Ms. Linne contends that she suffers constant pain in her left ankle and right shoulder as a result of these injuries.  In 2002, a lumbar MRI indicated that Ms. Linne is suffering from degenerative disc disease at L5-S1.  (A.R. 357.)  She has also been diagnosed with hyperthyroidism.  (A.R. 377, 382.)  There is some disagreement between the doctors in the record regarding Ms. Linne's mental impairments, which will be discussed in more detail below.

//

//

PAGE 3 - OPINION AND ORDER

## DISCUSSION

### I.     Standards

The initial burden of proof rests on a claimant to establish disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  The claimant must demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Commissioner must conduct a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520.  Each step is potentially dispositive.  At step one, the claimant is not disabled if the Commissioner finds he is engaged in substantial gainful activity.  *Yuckert*, 482 U.S. at 140; 20 C.F.R. § 404.1520(a)(4)(i).  At step two, the claimant is not disabled if he has no "medically severe impairment or combination of impairments."  *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(a)(4)(ii).  At step three, the claimant is disabled if his impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Yuckert*, 482 U.S. at 141; 20 C.F.R. § 404.1520(a)(4)(iii).

If the inquiry proceeds to step four, the Commissioner must assess the claimant's residual functional capacity ("RFC"), which is an assessment of the sustained, work-related activities the claimant can do on a regular and continuing basis.  20 C.F.R. § 404.1545(a); *see also* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184.  At step four, the claimant is not disabled if the Commissioner finds he retains the RFC to perform his past work.  *Yuckert*, 482 U.S. at 141;

20 C.F.R. § 404.1520(a)(4)(iv).  At step five, the Commissioner must determine whether the claimant is able to do any other work that exists in the national economy.  *Yuckert*, 482 U.S. at 142; 20 C.F.R. § 404.1520(a)(4)(v).  Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do.  *See Yuckert*, 482 U.S. at 141-42; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the Commissioner meets this burden, the claimant is not disabled.  *Tackett*, 180 F.3d at 1098-99.

A district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the "evidence is susceptible to more than one rational interpretation," one of which supports the Commissioner's final decision, the district court must uphold the Commissioner's decision.  *Andrews*, 53 F.3d at 1039-40; *Batson*, 359 F.3d at 1193; *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

II.    **The ALJ's Decision**

The ALJ found that Ms. Linne has not engaged in substantial gainful activity at any time relevant to this decision.  (A.R. 18.)  He found that Ms. Linne has the following severe impairments: chronic right should impingement, degenerative disc disease at L5-S1, hyperthyroidism, and traumatic arthritis of the left ankle.  (*Id.*)  The ALJ found that these impairments did not meet or medically equal a disorder listed in the Commissioner's regulations,

and assessed Ms. Linne's RFC as the full range of light work.  (A.R. 19.)  The ALJ applied these

findings to his analysis.

The ALJ found that Ms. Linne could no longer perform her past relevant work at step

four.  (A.R. 24.)  At step five, the ALJ found that Ms. Linne could perform jobs that exist in

significant numbers in the national economy.  (A.R. 24-25.)  Therefore, the ALJ found Ms. Linne

"not disabled" and ineligible for DIB and SSI benefits through the date of his decision.  (A.R.

25.)

Ms. Linne disputes the ALJ's findings with regard to her severe impairments, RFC, and

ability to sustain employment.  (Pl.'s Br. (#10) 2.)  First, she contends that the ALJ erred in

failing to include her Dysthymic Disorder, PTSD, ADHD, and Reading Disorder as severe at step

two.  (*Id.* at 3-6.)  Second, she argues that the ALJ improperly rejected the lay opinion of Ms.

Linne's sister.  (*Id.* at 6-7.)  Third, Ms. Linne contends that her inability to stand for more than

fifteen minutes at a time was erroneously omitted from her RFC.  (*Id.* at 7-10.)  Fourth, she states

that the ALJ erred at step five in finding that she could sustain regular and continuous work

activity from May 2003 through October 2006 because her surgeon authorized her to be off work

during that period for the purpose of her workers' compensation claim.  (*Id.* at 10-11.)  Finally,

Ms. Linne alleges that she meets the requirements of Medical Vocational Guideline 201.00(h)

beginning October 10, 2006, and the requirements of Medical Vocational Guideline 201.14

beginning June 15, 2007.  (*Id.* at 11.)

III.    <u>Severe Impairments at Step Two</u>

At step two in the sequential proceedings, the ALJ determines if the claimant has a

medically determinable physical or mental impairment that is "severe."  20 C.F.R. §

404.1520(a)(4)(ii).  The mere diagnosis of an ailment "says nothing about the severity of the

condition."  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  An impairment is only "severe"

if it "significantly limits your . . . ability to do basic work activities."  20 C.F.R. § 404.1520(c);

*see also* 20 C.F.R. § 404.1521.  Such an impairment must last, or be expected to last, twelve

months.  20 C.F.R. § 404.1509.

Ms. Linne argues that the ALJ's step two findings erroneously omitted the following

severe impairments: Dysthymic Disorder, PTSD, ADHD, and Reading Disorder.  (Pl.'s Br. (#10)

3-6.)  The Commissioner argues that the omissions were based on the proper legal standards and,

in the alternative, that if the ALJ erred, any error was harmless.  An error at step two is harmless

if the ALJ considers the non-severe impairments at later stages of his analysis.  *Lewis v. Astrue*,

498 F.3d 909, 911 (9th Cir. 2007).  However, in this case, the ALJ did not consider mental

limitations at later stages and did not place any mental limitations in Ms. Linne's RFC.  (A.R.

19.)  Therefore, if the ALJ erred in excluding any, or all, of these disorders, the error was not

harmless.

The ALJ is responsible for resolving conflicts in the medical evidence.  *Edlund v.*

*Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  The opinion of a treating physician is accorded

the most weight, while the opinion of an examining physician is entitled to greater weight than

that of a nonexamining physician.  *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995).  An

uncontradicted medical opinion of a treating or examining physician may only be rejected for

"clear and convincing" reasons.  *Id.* (citations omitted).  In rejecting the contradicted opinion of a

treating or examining physician, the ALJ must provide "specific and legitimate reasons that are

supported by substantial evidence in the record."  *Id.* at 830-31 (citing *Andrews*, 53 F.3d at 1043).

PAGE 7 - OPINION AND ORDER

In May 2005, examining psychologist Dr. Donna Wicher evaluated Ms. Linne at the request of the Oregon Department of Human Services. (A.R. 186.) Dr. Wicher administered several portions of the Wechsler Adult Intelligence Scale – III test, including arithmetic, the 21-Item test, which examines whether the subject is putting forth full effort during the testing, and the Comprehension, Similarities, and Information subtests. (A.R. 188.) As a result of the testing, Dr. Wicher diagnosed Ms. Linne with Dysthymic Disorder and assigned a GAF of fifty-nine.[2] (A.R. 189.) Dr. Wicher further found that Ms. Linne's "mild deficits in concentration, persistence, and pace would present the only psychological contribution to her difficulty sustaining employment," and would not actually prevent her from working. (A.R. 189-90.)

Non-examining state agency consultant, Dr. Paul Rethinger, similarly diagnosed Ms. Linne with Dysthymic Disorder but found that her mental impairments were not severe. (A.R. 192, 195.) On the B Criteria checklist, Dr. Rethinger found that Ms. Linne had no limitations with regard to activities of daily living or maintenance of social functioning, no episodes of decompensation, and only mild limitations in her ability to maintain concentration, persistence, or pace. (A.R. 202.)

Examining psychologist Dr. Steven Barry evaluated Ms. Linne in September 2007, at the request of her attorney. (A.R. 428.) He administered the Woodcock Reading Mastery Tests to measure Ms. Linne's reading ability. (A.R. 432.) The results indicate that her reading ability

_____

[2] A GAF score reports the clinician's judgment of an individual's overall level of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000) [hereinafter DSM-IV-TR]. The clinician must consider an individual's functioning on a hypothetical continuum of mental health-illness, and place the individual on a 100 point scale. *Id.* at 34. A GAF score from fifty-one to sixty indicates than an individual has "moderate symptoms . . . [or] moderate difficulty in social, occupational, or school functioning." *Id.*

PAGE 8 - OPINION AND ORDER

ranges from the first to fourth grade levels, varying by subtest. (*Id.*) Dr. Barry also administered the California Verbal Learning test, on which Ms. Linne's score placed her in the bottom two percent of her peers. (A.R. 433.) Ms. Linne's results on the Attention-Deficit/Hyperactivity Disorder Test indicated that she has an above average likelihood of having ADHD. (*Id.*) Finally, Dr. Barry administered the d2 test, which examines a subject's attention and concentration. (A.R. 434.) Eighteen percent of Ms. Linne's responses were erroneous, demonstrating a lack of attention to detail. (A.R. 432, 434.) As a result of these tests and his conversation with Ms. Linne, Dr. Barry diagnosed her with ADHD, Dysthymic Disorder, PTSD (due to childhood sexual abuse), Reading Disorder, and rule out Borderline Intellectual Functioning, and assigned a GAF of forty-seven to fifty.[3] (A.R. 435A.)

Dr. Linda Hungerford, Ms. Linne's primary care physician, concurred with Dr. Barry's assessment. (A.R. 438.) She explained that Ms. Linne was unable to seek sedentary employment due to her literacy issues. (A.R. 382.) Further, her depression, ADHD, and PTSD "have made it difficult for her to maintain any kind of employment." (A.R. 438.) Dr. Hungerford also noted that Ms. Linne has "a difficult time coping with anger due to her history of severe abuse as a child." (A.R. 369.) Ms. Linne's treating orthopedist, Dr. Paul Puziss, similarly noted that Ms. Linne told him she was dyslexic and illiterate (reading only at a third grade level) and stated that Ms. Linne has become increasingly depressed over the years and had attempted suicide in 1992. (A.R. 398.)

---

[3] A GAF score from forty-one to fifty indicates that an individual has "[s]erious symptoms . . . [or a] serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

Ms. Linne argues that Dr. Barry's diagnoses of ADHD, PTSD, and Reading Disorder are uncontradicted because Dr. Wicher did not test for or specifically reject these disorders. (Pl.'s Br. (#10) 5.) Dr. Wicher's evaluation makes clear that she knew Ms. Linne had been hyperactive as a child, was prescribed Ritalin, had taken some special education classes, and suffered from nightmares. (A.R. 186-87.) She chose not to follow up on this information by eliciting further information from Ms. Linne or conducting the tests used by Dr. Barry. The court has no way of knowing whether she failed to follow up because she considered the relevant diagnoses and found them to be improper under the circumstances or whether she failed to consider them at all. Speculation on such an issue is improper; therefore, the diagnoses themselves will be considered uncontradicted. However, Dr. Wicher did state that "Ms. Linne's presumed mild deficits in concentration, persistence, and pace would present the only psychological contribution to her difficulty sustaining employment at this time." (A.R. 189.) Thus, the deficits resulting from the diagnoses, i.e., whether Ms. Linne's mental health problems "significantly limit[ her] . . . ability to do basic work activities," 20 C.F.R. § 404.1520(c), are contradicted. The severity of Ms. Linne's Dysthymic Disorder is similarly contradicted, as Dr. Wicher did not feel it would affect her ability to work (A.R. 189), but Drs. Barry, Hungerford, and Puziss, all considered it severe (A.R. 434-35, 438, 398).

The ALJ gave Dr. Barry's report little weight. (A.R. 19.) The ALJ gave the diagnosis of Reading Disorder little weight because Ms. Linne graduated with a regular high school degree, testified that she could read the newspaper, and indicated that she read during her leisure time. (*Id.*) The ALJ also disagreed with the diagnoses of ADHD and PTSD because the diagnosis of ADHD was based primarily on Ms. Linne's self-report of symptoms, which the ALJ found not

entirely credible, and Ms. Linne has not required treatment for ADHD or PTSD.  (*Id.*)   The ALJ

gave Dr. Hungerford's opinion little weight because she had very little contact with Ms. Linne

from 2001 to 2006 and her opinions were not consistent with the treatment record or the

claimant's daily activities.  (A.R. 23.)  He also gave little weight to Dr. Puziss's findings because

they were unsupported by evidence in the treatment record and outside the scope of the doctor's

expertise.  (A.R. 22.)  Because the ALJ had different reasons for rejecting each diagnosis, I will

examine them individually below.

> **A.**    *Reading Disorder*

The ALJ provided several reasons for his determination that Ms. Linne does not have a

medically determinable reading disorder.  (A.R. 19.)  First, the ALJ noted that Ms. Linne

graduated from high school with a regular diploma, which is not consistent with having a reading

level of first to fourth grade.  (*Id.*)  Second, Ms. Linne indicated to Dr. Wicher that she read

during her free time.  (A.R. 19, 188.)  Third, Ms. Linne testified that she could read the comics in

the newspaper.  (A.R. 19, 482.)  Fourth, in a different portion of his opinion, the ALJ noted that

Ms. Linne's sister, Susan Linne, reported that Ms. Linne reads the newspaper, Bible, and

mysteries, and can discuss and remember what she reads.  (A.R. 23, 120.)  These are not "clear

and convincing" reasons to dispute the uncontradicted medical evidence from examining source

Dr. Barry and treating sources Dr. Hungerford and Dr. Puziss.

However, they are "specific and legitimate reasons that are supported by substantial

evidence in the record," *Lester,* 81 F.3d at 830-31 (citation omitted), to conclude that the Reading

Disorder is not "severe" under the regulations.  Although I might have come to a different

conclusion, I hold that the ALJ did not legally err in failing to include Reading Disorder as a severe impairment at step two.

**B.      *Posttraumatic Stress Disorder***

**1.      Dr. Barry's Diagnosis**

The ALJ indicated that he gave little weight to Dr. Barry's diagnosis of PTSD because Ms. Linne "has not required any treatment for posttraumatic stress disorder." (A.R. 19.)  This is not a "clear and convincing" reason to reject Dr. Barry's uncontradicted diagnosis. *See Lester*, 81 F.3d at 830 (citations omitted).  There is no information in the record concerning why Ms. Linne has not received treatment for PTSD.  It is not uncommon for persons with mental illnesses to remain untreated, or even undiagnosed.  In fact, Dr. Barry specifically notes in his letter following the ALJ's opinion that many people with PTSD are ashamed of their illness, are reluctant to share their personal history and symptoms, and do not realize that those symptoms may be ameliorated or remedied.  (A.R. 456.)  Furthermore, Dr. Barry's diagnosis was based on an in depth clinical interview and is supported by the opinion of Dr. Hungerford, Ms. Linne's treating physician, as discussed below.  (A.R. 430, 434.)  Thus, the ALJ's rejection of Dr. Barry's opinion was not based on the proper legal standards.

**2.      Dr. Hungerford's Agreement**

Dr. Hungerford expressed agreement with Dr. Barry's diagnosis of PTSD.  (A.R. 438.) The ALJ gave limited weight to this opinion because Dr. Hungerford had very little contact with Ms. Linne from 2001 to 2006 and her opinions were not consistent with the treatment record or the claimant's daily activities.  (A.R. 23.)  These are proper bases on which to reject a physician's opinion; however, they are inapplicable in this case.

First, the ALJ fails to indicate how the diagnosis of PTSD is inconsistent with Ms. Linne's daily activities, and I am unable to divine which activities might support such a finding. Second, Dr. Hungerford treated Ms. Linne for almost ten years before the period called into question by the ALJ. She was aware of Ms. Linne's limits before 2001 and has now resumed treating Ms. Linne. Dr. Hungerford indicates that Ms. Linne's psychological issues, including depression, ADHD, and PTSD, "have been significant ever since [Dr. Hungerford has] known her, dating back to her suicide attempt in 1992." (A.R. 438.)

Finally, Dr. Hungerford's treatment notes support Dr. Barry's diagnosis of PTSD. In September 2007, Ms. Linne came to Dr. Hungerford with an injured hand, which she had hit into a wall when she was angry. (A.R. 369.) Dr. Hungerford explained that Ms. Linne has "a difficult time coping with anger due to her history of severe abuse as a child." (*Id.*)

The ALJ failed to give "clear and convincing" reasons to reject Dr. Hungerford's opinion regarding the PTSD diagnosis. On remand the ALJ must determine whether Ms. Linne's symptoms related to her PTSD "significantly limit[ her] . . . ability to do basic work activities." 20 C.F.R. § 404.1520(c).

### C.    *Attention Deficit/Hyperactivity Disorder*

#### 1.    **Dr. Barry's Diagnosis**

The ALJ indicated that he gave Dr. Barry's diagnosis of ADHD little weight because it was based primarily on Ms. Linne's self-report of symptoms, which he found not entirely credible. An ALJ may reject medical opinions based in large part on a "claimant's self-reports that have been properly discounted as incredible." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)).

PAGE 13 - OPINION AND ORDER

However, a claimant's lack of credibility is insufficient to reject an examining source's opinion "where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r Soc. Sec. Admin.*, 528 F.3d 1194, 1199-200 (9th Cir. 2008) (citing *Edlund*, 253 F.3d at 1159).

Dr. Barry's diagnosis of ADHD was based in large part on his observations during his session with her. (A.R. 431-34.) He noted specifically in his evaluation that she "was a terrible listener," that she interrupted him constantly and was unable to change this behavior even after it was pointed out to her, and that she jumped from one topic to another and was highly distractible. (A.R. 431, 434.) In a letter written after the ALJ's report, Dr. Barry specifically addressed the ALJ's concerns regarding the ADHD test and diagnosis. (A.R. 456-57.) He stated unequivocally that his diagnosis was based "both on self-report and on [his] observations of [Ms. Linne]." (A.R. 456.) He also clarified that the ADHD test was based not only on Ms. Linne's self-report, but also on her ability to provide examples of the problematic behavior, and on Dr. Barry's interpretations of those examples. (A.R. 457.) Dr. Barry states that he took her responses "with a grain of salt" and did not score each item in the way Ms. Linne had indicated they should be scored, but rather based his score on his observations of her and his understanding of her past behavior. (*Id.*) Ms. Linne's score of 111, giving her an above average probability of ADHD, was achieved by scoring "the questionnaire very conservatively and cautiously." (*Id.*)

The ALJ also rejected Dr. Barry's diagnosis because no treating source has indicated that she requires treatment for ADHD. (A.R. 19.) As discussed above, a failure to receive treatment is not "clear and convincing" evidence that the diagnosis is erroneous. Furthermore, Dr. Wicher and Dr. Barry both noted that Ms. Linne received treatment for ADHD as a child. (A.R. 186,

PAGE 14 - OPINION AND ORDER

429.) Thus, there is evidence in the record supporting the diagnosis as a lifelong problem.  The

ALJ's rejection of Dr. Barry's diagnosis was, therefore, not based on the proper legal standards.

### 2.    Dr. Hungerford's Agreement

As with the diagnosis of PTSD, Dr. Hungerford expressed agreement with Dr. Barry's

diagnosis of Ms. Linne's ADHD.  (A.R. 438.)  The ALJ gave limited weight to this opinion

because Dr. Hungerford had very little contact with Ms. Linne from 2001 to 2006 and her

opinions were not consistent with the treatment record or the claimant's daily activities.  (A.R.

23.)

First, as discussed above, Dr. Hungerford has a long history of treating Ms. Linne, and a

gap of five years does not discredit her opinions based on that long history.  Second, the ALJ has

once again failed to indicate what daily activities are inconsistent with a diagnosis of ADHD.

Third, it is unclear from the ALJ's phrasing whether he found Dr. Hungerford's opinion

unsupported by her own treatment notes, inconsistent with her own treatment notes, or

inconsistent with treatment notes in the record as a whole.  An "ALJ need not accept the opinion

of any physician, including a treating physician, if that opinion is brief, conclusory, and

inadequately supported by clinical findings." *Thomas*, 278 F.3d at 957 (citing *Matney ex rel.

Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).  Dr. Hungerford's treatment records do

not discuss ADHD or its symptoms, and this would be a proper basis on which to reject Dr.

Hungerford's opinion.  However, the ALJ's reasoning is not clear on this issue.  Therefore, I hold

that the ALJ failed to provide "clear and convincing" reasons to reject Dr. Hungerford's opinion

as to Ms. Linne's ADHD.

On remand, the ALJ must determine whether Ms. Linne's ADHD is severe under the
regulations. In so doing, the ALJ should look closely at Dr. Barry's report, which explains how
"her general 'style' and manner of being would prove very distressing and difficult" for potential
co-workers. (A.R. 435.) He should also take into account Dr. Barry's conclusion that Ms. Linne
has severe deficits in her ability to interact appropriately with the general public, co-workers, and
peers, as well as in using socially appropriate behavior.[4] (A.R. 437.)

**D.**    *Dysthymic Disorder*

The ALJ determined that Ms. Linne's Dysthymic Disorder "does not result in any
significant work-related functional limitations" and was therefore not severe at step two. (A.R.
19.) Both Dr. Wicher and Dr. Barry, as well as the agency's consulting psychologist, diagnosed
Ms. Linne with Dysthymic Disorder, which is a chronic form of depression. (A.R. 189, 435A;
DSM-IV-TR, *supra*, at 376-81.) Dr. Barry explained that Ms. Linne's depression was expressed
in her "passive desire to be dead, high level of anger/irritability, anhedonia, worthlessness and
helplessness, sleep disturbance, low energy," and isolation from others. (A.R. 434.) These
symptoms, particularly a high level of anger and irritability, anhedonia, and isolation from others,
would "significantly limit[] your . . . ability to do basic work activities." 20 C.F.R. §
404.1520(c). In addition, Dr. Hungerford and Dr. Puziss both discussed Ms. Linne's depression.
Dr. Hungerford diagnosed Ms. Linne with a history of depression in her treatment notes and
prescribed antidepressants. (A.R. 369-70.) She further stated that Ms. Linne's depression has "at
times been disabling for her, including a previous suicide attempt" and was "quite a bit worse [in

---

[4] These results are from a Mental Residual Functional Capacity Assessment which
defines "severe" as indicating "that the activity is totally precluded on a sustained basis and
would result in failing even after short duration; e.g., 5-15 minutes." (A.R. 436.)

late 2006] due to her many medical difficulties." (A.R. 382.) Dr. Puziss noted that Ms. Linne "has been increasingly depressed over the years . . . [and h]er depression is even worse due to her multiple medical conditions." (A.R. 398.)

The ALJ gave Dr. Puziss's opinion limited weight because his assessments concerning Ms. Linne's "psychological limitations are clearly outside the scope of his expertise, and [are] unsupported by his objective treatment records." (A.R. 22.) These are specific and legitimate reasons to reject the contradicted opinion of Dr. Puziss regarding the severity of Ms. Linne's Dysthymic Disorder.

As discussed above, the ALJ gave Dr. Hungerford's opinion limited weight because she had very little contact with Ms. Linne between 2001 and 2006, and her opinions are not consistent with the treatment record or the claimant's daily activities. (A.R. 23.) However, Dr. Hungerford's treatment records all indicate that Ms. Linne was diagnosed with depression and was prescribed anti-depressant medications. (*See* A.R. 369-70.) In fact, Ms. Linne first saw Dr. Hungerford after her 1992 suicide attempt, and has struggled with "severe depression" since that time. (A.R. 438.) Thus, the ALJ's rejection of Dr. Hungerford's opinion was not based on the proper legal standards.

Finally, the ALJ gave no reason for rejecting Dr. Barry's opinion that Ms. Linne's Dysthymic Disorder caused several severe symptoms that could "significantly limit[ her] . . . ability to do basic work activities." 20 C.F.R. § 404.1520(c). Therefore, Dysthymic Disorder should be included as a severe impairment at step two.

//

//

PAGE 17 - OPINION AND ORDER

IV.   <u>**Susan Linne's Lay Witness Statement**</u>

The ALJ has a duty to consider lay witness testimony. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); 20 C.F.R. §§ 416.913(d)(4), 416.945(a)(3). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). The value of lay witness testimony lies in their eyewitness observations, which may "often tell whether someone is suffering or merely malingering." *Id.* at 919. The ALJ may not reject such testimony without comment, but he may reject lay testimony inconsistent with medical evidence. *Lewis*, 236 F.3d at 511. If an ALJ rejects lay witness testimony entirely, he must give reasons germane to the witness. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

Ms. Linne lives with her sister, Susan Linne, who provided testimony in the form of a questionnaire. (A.R. 115-23.) Ms. Linne contends that the ALJ failed to consider Susan's testimony that Ms. Linne "rarely" walks because "it causes ankle pain," (A.R. 117), can sleep only four or five hours a night before waking up in pain, (A.R. 118), that "between her shoulder and her ankle she's in constant pain and has lost range of motion," and that the pain and her inability to work are "a source of depression" (A.R. 122).

Although the ALJ recounts some of Susan's testimony, none of the above is included in the ALJ's opinion. (A.R. 23.) The ALJ found Susan's testimony generally credible, disagreeing only with the rather severe side effects Susan reported for Ms. Linne's medications. (*Id.*) Susan's testimony regarding her sister's pain corroborates Ms. Linne's own testimony, which the ALJ found not entirely credible. (A.R. 21.) As such it is highly relevant, should have been considered by the ALJ, and could not be rejected without comment. *See Lewis*, 236 F.3d at 511.

PAGE 18 - OPINION AND ORDER

On remand, the ALJ must consider Susan's testimony or provide legally proper reasons for rejecting it.

**V.     <u>Ability to Stand for More Than Fifteen Minutes</u>**

Ms. Linne contends that the ALJ erred in rejecting Dr. Puziss's opinion, supported by that of Dr. Hungerford, that Ms. Linne can stand for no more than fifteen minutes at a time without having to rest by elevating her leg for fifteen minutes to an hour.  (Pl.'s Br. (#10) 7-10.)  Such a restriction would likely limit Ms. Linne to sedentary, rather than light, work, or would at least greatly restrict the type of light work Ms. Linne could perform.  *See* 20 C.F.R. § 404.1567(a)-(b) (defining sedentary and light work).

As discussed above, the ALJ is responsible for resolving conflicts in the medical evidence.  *Edlund*, 253 F.3d at 1156.  Generally, the ALJ must accord greater weight to the opinion of a treating physician than that of an examining physician.  *Lester*, 81 F.3d at 830.  If two opinions conflict, an ALJ must give "'specific and legitimate reasons' supported by substantial evidence in the record" for discrediting a treating physician in favor of an examining physician.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

Dr. Puziss, Ms. Linne's treating orthopedist since approximately 1984,[5] stated in October 2007 that, "[a]t least as of [Ms. Linne's] surgery of [May 22, 2003], and probably for the year prior, she was unable to stand for more than [fifteen] minutes at a time without having to rest by elevating her leg for [fifteen] minutes to an hour following such activity."  (A.R. 345, 439.)  He indicated in September 2007 that Ms. Linne can only walk about two blocks without increased

––––––––––––––––––––––––

[5] The record is unclear regarding exactly when Dr. Puziss began treating Ms. Linne, in 1984 after her original ankle injury, (A.R. 345), or after her fall at the 7-Eleven in 1986 (A.R. 439).

PAGE 19 - OPINION AND ORDER

symptoms or the need to rest and can stand or walk less than two hours in an eight hour day (the lowest amount of time available on the form). (A.R. 394.) Even when Ms. Linne is sitting, Dr. Puziss states that she would need to elevate her foot to seat level at least five percent of an eight hour day. (*Id.*)

Dr. Hungerford, Ms. Linne's primary care physician since 1992, agreed that Ms. Linne needs to elevate her feet frequently during the day due to her ankle surgeries and leg edema. (A.R. 438.) Examining physicians, Dr. George McNeill and Dr. Dennis Smith, examined Ms. Linne and her medical history as a consultative examination for her ongoing workers' compensation claim. (A.R. 344.) They explained that Ms. Linne's ankle pain increased when she stood or walked too much, that she can walk only about fifteen minutes before her ankle starts bothering her, and she has to stand on her right foot. (A.R. 346.) Upon physical examination, they determined that Ms. Linne's left ankle was slightly swollen and that she walked "with a stiff-legged antalgic gait on the left, almost a hop, with no obvious motion at her ankle joint." (A.R. 362.) Ms. Linne's ankle was tender over the incision site as well as in the anterior ankle mortise and across the dorsum of the foot. (A.R. 363-64.) They also noted that Ms. Linne has suffered several falls because of the pain and loss of sensation in her left foot. (A.R. 366.) In conclusion, Dr. McNeill and Dr. Smith determined that Ms. Linne could perform only sedentary work. (A.R. 367.)

Dr. Webster conducted an examination of Ms. Linne in May 2005. (A.R. 181.) She noted that Ms. Linne moved around the examination room without a limp, but limped significantly when asked to walk down the hall. (A.R. 182.) Dr. Webster stated that it was difficult for Ms. Linne to stand on her left leg or to walk heel-to-toe due to her ankle injuries and

that she might want to use a cane to walk on uneven surfaces.  (A.R. 183.)  Finally, Dr. Webster found that there was "minimal objective evidence that would restrict [Ms. Linne from] standing and walking.  Although she has a fair amount of pain in the left ankle, she has good range of motion, no swelling, no bony exostosis, and some inconsistency in limping."  (A.R. 185.)  Based on a review of Ms. Linne's treatment records, state agency consultant Dr. Mary Ann Westfall, a non-examining physician, reported in May 2005, that Ms. Linne could stand and/or walk for a total of about six hours in an eight-hour workday.  (A.R. 208.)

The ALJ gave significant weight to the opinions of Dr. Webster and Dr. Westfall.  (A.R. 22, 23-24.)  He gave little weight to the opinions of Dr. Puziss, Dr. Hungerford, Dr. McNeill, and Dr. Smith.  (A.R. 22-23.)   The opinions of Dr. Puziss, Dr. Hungerford, Dr. McNeill, and Dr. Smith that Ms. Linne is extremely limited in her ability to stand is contradicted, therefore the ALJ must give "specific and legitimate reasons that are supported by substantial evidence in the record" for rejecting the opinion.  *Lester*, 81 F.3d at 830-31 (citing *Andrews*, 53 F.3d at 1043).

### A.    *Dr. Puziss*

The ALJ gave little weight to Dr. Puziss's September and October 2007 opinions because he found them internally inconsistent and inconsistent with examination findings.  (A.R. 22.)  Specifically, Ms. Linne reported in July 2005 that her ankle pain resolved after an injection of cortisone and Dr. Puziss stated that it required no further treatment.  (A.R. 329-30.)  The ALJ also notes that the limitation is inconsistent with the findings of Dr. Webster in May 2005.  (A.R. 22.)

The ALJ does not explain how Dr. Puziss's September and/or October 2007 reports are internally inconsistent and I do not perceive any significant inconsistencies in the reports.

PAGE 21 - OPINION AND ORDER

Therefore, I find that this was not a proper reason to reject Dr. Puziss's opinion.  There are

examination findings by Dr. Puziss and by Dr. Webster that are somewhat inconsistent with Dr.

Puziss's opinion that Ms. Linne can stand for only fifteen minutes at a time.  In May 2005, Dr.

Webster determined that there was "minimal objective evidence that would restrict [Ms. Linne

from] standing and walking." (A.R. 185.)  As the ALJ noted, Dr. Puziss reported that Ms. Linne's

ankle pain was "dramatically decreased" after a cortisone injection on June 8, 2005.  (A.R. 329.)

At that time, Dr. Puziss stated that she "requires no treatment currently."  (A.R. 330.)  However,

stating that no treatment is currently necessary is different than saying that no treatment will ever

be required in the future.[6]  In fact, in September 2005, Dr. Puziss reiterated his feeling that Ms.

Linne was disabled and required physical therapy for her ankle.  (A.R. 419.)  Then, in January

2006, he diagnosed Ms. Linne with a fresh avulsion fracture of her left ankle, which occurred

when her foot was numb, causing her to fall and twist her ankle.  (A.R. 412-13.)  Dr. Puziss's

opinion is not truly inconsistent with his own treatment records; a temporary decrease in pain due

to a cortisone injection does not indicate that the ankle injury itself has healed or improved in any

meaningful way.

I hold that the ALJ improperly discredited Dr. Puziss's opinion that Ms. Linne can only

stand for fifteen minutes at a time.  An ALJ must give greater weight to the testimony of a

treating physician than that of an examining physician.  *Lester*, 81 F.3d at 830.  First, Dr. Puziss

has known and treated Ms. Linne for twenty-five years and is a specialist in the field of

---

[6] It is important to note that the beneficial effects of a cortisone injection are temporary, lasting from several days to several weeks, and repeated injections may have serious side effects, including damage to joint tissues, muscle weakness, and tendon rupture.  3 Robert K. Ausman & Dean E. Snyder, *Medical Library: Lawyers Edition*, *Orthopedics*, § 4:174(d)-(e) (1989).

orthopedics.  (A.R. 345.)  Dr. Webster met with Ms. Linne for twenty-five minutes.  (A.R. 181.)

Second, logically, the contradictory opinion that lowers the standard for rejecting medical

testimony from "clear and convincing" evidence to "specific and legitimate reasons supported by

substantial evidence," cannot alone qualify as a "specific and legitimate reason."  This is

particularly true when the basic standard requires that the opinion of a treating physician be given

greater weight than that of an examining physician.  Dr. Webster's lone opinion is therefore an

insufficient basis upon which to reject Dr. Puziss's opinion.

### B.    *Dr. Hungerford*

The ALJ gave little weight to Dr. Hungerford's statement that Ms. Linne must elevate her

foot because there was no evidence to support the statement, Dr. Hungerford had little contact

with Ms. Linne between 2001 and 2006, and the opinion was inconsistent with Ms. Linne's daily

activities.  (A.R. 23.)  An "ALJ need not accept the opinion of any physician, including a treating

physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."

*Thomas*, 278 F.3d at 957 (citing *Matney ex rel. Matney*, 981 F.2d at 1019).  Dr. Hungerford's

conclusion that Ms. Linne must elevate her foot during the work day is unsupported by her

treatment notes or clinical findings.  Thus, the ALJ did not err in rejecting her opinion.

### C.    *Dr. McNeill and Dr. Smith*

Finally, the ALJ gave little weight to the opinion of Dr. McNeill and Dr. Smith because

their findings were not consistent with a restriction to sedentary work and their report that she

walked with an antalgic gate was in conflict with Dr. Webster's finding that her gait was

inconsistent, i.e., that she did not limp while moving around the examination room, but did limp

when walking down the hallway.  (A.R. 23, 182.)  Specifically, the ALJ noted that Ms. Linne

exhibited full strength in her lower extremities, and although there was reduced range of motion and tenderness, there were no clear neurological findings.  (A.R. 23.)

The ALJ fails to explain how the absence of neurological findings or the fact that Ms. Linne maintains strength in her lower extremities is actually inconsistent with a restriction to sedentary work.  Pain and internal damage to an ankle can exist without clear neurological findings and do not necessarily impact the overall strength of a limb.  Dr. Webster's opinion that Ms. Linne did not limp in the examination room is not a "specific and legitimate reason supported by substantial evidence" to reject with Dr. McNeill and Dr. Smith's opinion that Ms. Linne did limp during their consultation.  First, Dr. Webster's findings were internally inconsistent.  Dr. Webster found that Ms. Linne was unable to stand on her left leg and was unable to walk heel-to-toe due to her ankle injuries.  (A.R. 183.)  Yet, despite being unable to stand or walk normally on her left ankle, Dr. Webster found that Ms. Linne did not walk with a limp.  An inability to walk heel-to-toe is synonymous with limping.  Second, the examinations were over a year apart and Ms. Linne's ankle had suffered a fracture in the interim; therefore, it is possible that her limp became more pronounced between the examinations.  (A.R. 181, 344, 412-13.)  I hold that the ALJ did not apply the proper legal standards in rejecting the opinion of Dr. McNeill and Dr. Smith.

**VI.**   **Ability to Work Between May 27, 2003, and October 10, 2006**

Ms. Linne argues that she should be considered disabled for the period May 27, 2003, to October 10, 2006, because Dr. Puziss authorized her to be off work during that time.  (Pl.'s Br. (#10) 11.)  First, it must be noted that Ms. Linne makes no legal arguments in this portion of the briefing.  No explanation is given for how or why the ALJ should have considered Dr. Puziss's

authorization of Ms. Linne's disability for workers' compensation. This alone is reason enough to reject this argument.

Second, disability has both a medical and vocational component. *See* 20 C.F.R. § 416.960. Statements about the issue of disability are vocational determinations. SSR 96-5p, 1996 WL 374183. Because medical sources do not have the expertise to determine the vocational component of disability, a statement of disability by a physician is not accorded much weight. *See* 20 C.F.R. § 416.927(e)(1). The ALJ indicated that he gave Dr. Puziss's opinion that Ms. Linne was disabled "little weight" because it "involve[d] vocational issues of which Dr. Puziss has no expertise." (A.R. 22.) This is a proper legal standard; therefore the ALJ did not err by failing to adopt Dr. Puziss's opinion that Ms. Linne was disabled between May 27, 2003, and October 10, 2006.

## VII.    Medical Vocational Guidelines 201.00(h) and 201.14

Ms. Linne contends that she is disabled under the terms of Medical Vocational Guideline 201.00(h) as of October 10, 2006, and under the terms of Guideline 201.14 as of June 15, 2007.[7] (Pl.'s Br. (#10) 11-12.)   Guideline 201.00(h) states that a claimant between the ages of forty-five and forty-nine is disabled if he or she is restricted to sedentary work, is unskilled or has no transferable skills, can no longer perform past relevant work, and is "unable to communicate in English, or [is] able to speak and understand English but [is] unable to read or write in English." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h)(1). The ALJ properly found that Ms. Linne's Reading Disorder was not severe, because the ALJ pointed to substantial evidence in the record

---

[7] Actually, Ms. Linne's briefing cites Guideline 201.04 in this section; however, in an earlier portion of the briefing she cites Guideline 201.14, which is the proper citation as Ms. Linne is not yet a person of advanced age (age fifty-five and over).

that Ms. Linne can read in English.  *See* Part III.A.  Therefore, even assuming she meets all the other criteria, Ms. Linne does not qualify as disabled under Guideline 201.00(h).

Guideline 201.14 states that a claimant closely approaching advanced age (age fifty to fifty-four), who is limited to sedentary work, a high school graduate with no training that provides for direct entry into skilled work, and whose previous work experience is skilled or semiskilled and the skills are not transferable, is disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14.  The ALJ determined that Ms. Linne retains the RFC to perform the full range of light work.  (A.R. 19.)  Therefore, Guideline 201.14 is inapplicable to her situation under the ALJ's current findings.  If, on remand, the ALJ determines that Ms. Linne is restricted to sedentary work, then continued analysis under Guideline 201.14 would be proper.[8]

**VIII.  Remand**

After finding the ALJ erred in his decision denying Ms. Linne's application for benefits, I must determine the proper remedy.  I have discretion to remand for further proceedings or for immediate payment of benefits.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's

---

[8]Ms. Linne was born June 15, 1957, therefore she was fifty-years-old on June 15, 2007, qualifying as a claimant closely approaching advanced age.  (A.R. 77, 81.)  Ms. Linne's previous work experience includes being a care giver/provider.  (A.R. 89, 110.)  The VE testified that this job is classified as semiskilled.  (A.R. 488.)  However, the ALJ did not elicit testimony regarding whether any of her skills were transferrable because he found that it was not material to his determination that she was not disabled.  (A.R. 24.)  If Ms. Linne is limited to sedentary work on remand, the ALJ should determine whether Ms. Linne's skills from her previous work as a care giver are transferrable.  If they are not, she was disabled as of June 15, 2007, when she turned fifty years old.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14.

decision. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989). However, remand for further

proceedings "is appropriate 'where additional administrative proceedings could remedy defects'"

in the ALJ's decision. *Rodriguez*, 876 F.2d at 763 (quoting *Bilby v. Schweiker*, 762 F.2d 716,

719 (9th Cir. 1985)).

Here, the ALJ improperly rejected medical opinions, and omitted severe impairments

both at step two and in crafting the RFC. Further proceedings are necessary for the ALJ to

properly evaluate this evidence, reassess Ms. Linne's RFC accordingly, and obtain vocational

expert testimony, if necessary.

## CONCLUSION

The Commissioner's decision that Ms. Linne does not suffer from disability and is not

entitled to benefits under Title II or XVI of the Social Security Act is not based on correct legal

standards. The Commissioner's decision is REVERSED and the case is REMANDED FOR

FURTHER PROCEEDINGS consistent with this opinion.

IT IS SO ORDERED.

Dated this _10th_ day of August, 2009.

/s/ Michael W. Mosman____
MICHAEL W. MOSMAN
United States District Judge

PAGE 27 - OPINION AND ORDER